SANFORD STREET LOCAL DEVELOPMENT CORPORATION, Plaintiff,

v.

TEXTRON, INC., Defendant and Third–Party Plaintiff,

v.

DELTA PROPERTIES, Delta Properties, Inc., Bruce D. Langlois, Bruce P. Langlois, Joel J. Langlois, Kimberly Sue Sorrelle, Mary J. Langlois, and Great Lakes Development Corporation, Third–Party Defendants.

DELTA PROPERTIES, Delta Properties, Inc., Bruce D. Langlois, Bruce P. Langlois, Joel J. Langlois, Kimberly Sue Sorrelle, Mary J. Langlois, Third–Party Cross–Plaintiffs/Cross–Defendants,

v.

GREAT LAKES DEVELOPMENT CORPORATION, Third–Party Cross–Defendant/Cross–Plaintiff.

GREAT LAKES DEVELOPMENT CORPORATION, Third–Party Counterplaintiff,

v.

TEXTRON, INC., Third–Party Counterdefendant.

GREAT LAKES DEVELOPMENT CORPORATION, Third–Party Counterplaintiff,

v.

SANFORD STREET LOCAL DEVELOPMENT CORPORATION, Third–Party Counterdefendant.

No. 1:90–CV–582.

United States District Court, W.D. Michigan, S.D.

Aug. 8, 1991.

Steven C. Kohl, Landman, Latimer, Clink & Robb, Muskegon, Mich., for Sanford Street Local Development Corp.

Paul T. Sorensen, Devin Sean Schindler, Warner, Norcross & Judd, Grand Rapids, Mich., for Textron, Inc.

Charles E. Barbieri, Webb A. Smith, Foster, Swift, Collins & Smith, P.C., Lansing, Mich., for Delta Properties Inc., Delta Properties, Bruce D. Langlois, Bruce P. Langlois, Joel J. Langlois, Kimberly Sue Sorrelle and Mary J. Langlois.

Thomas C. Shearer, McShane & Bowie, Grand Rapids, Mich., for Great Lankes Development Inc.

## OPINION

BENJAMIN F. GIBSON, Chief Judge.

### I.

This litigation, in part, is the result of the discovery of oils containing PCBs in the transformer penthouse at an old factory in Muskegon Heights, Michigan. In its complaint, plaintiff Sanford Street Local Development Corporation ("Sanford") alleges that Textron, Inc. ("Textron") is responsible for some, if not all, of the response costs under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–75, and the common law of Michigan. Pending before the Court are motions for summary judgment filed by the defendant and vari-

ous third-party defendants impled by Textron.[1] For the reasons stated below, the motions are granted in part and denied in part.

## II.

From the early part of this century until 1982, defendant Textron operated a foundry commonly known as CWC Plant # 1 in Muskegon Heights, Michigan. The economic downturn of the early 1980s forced Textron to "mothball" the facility with the hope that it could be reopened at a later date. As a result, the plant's electrical system, including several transformers containing PCBs, remained operative.

In early 1984, Textron determined that there was no longer a viable market for the type of equipment manufactured at CWC Plant # 1 and decided to either sell or demolish the plant. After an attempt to donate the building to the City of Muskegon Heights proved unsuccessful, Textron sold it to third-party defendant Delta Properties, Inc. ("Delta"), a corporation specializing in the refurbishing of old manufacturing sites for other uses, for $25,000.00, an amount substantially below its appraised value of $200,000.00. All of the CWC Plant # 1's electrical equipment, including the transformers containing PCBs, was included in the sale.

Although Delta owned the facility for approximately ten months, its redevelopment plans never materialized due to disputes with the City of Muskegon Heights. During that time, Textron disconnected the building from its central power grid and an inspection by the Michigan Department of Natural Resources found no leakage from the transformers. It sold the building in August of 1987 to third-party defendant Great Lakes Development Corporation ("Great Lakes"), another refurbisher of manufacturing facilities, for the sum of $1,000.00.

Like Delta, Great Lakes also encountered difficulty in its dealings with the City of Muskegon Heights. After a portion of CWC Plant # 1 was rezoned, it decided to sell the facility. Plaintiff Sanford purchased the building on August 12, 1988 for $30,000.00. During a post-sale inspection in December of 1988, Sanford representatives discovered the presence of PCB-containing oils in the penthouse housing the transformers. Sanford incurred response costs and this litigation ensued.[2]

## III.

Summary judgment is appropriate only where no genuine issue of fact remains to be decided so that the moving party is entitled to judgment as a matter of law. *Atlas Concrete Pipe, Inc. v. Roger J. Au & Son, Inc. (In re Atlas Concrete Pipe, Inc.)*, 668 F.2d 905, 908 (6th Cir.1982). There is no material issue of fact for trial unless, in viewing the evidence in favor of the nonmoving party, a reasonable fact finder could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11 (citations omitted).

The party moving for summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the record which demonstrate the absence of a material issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once this has been done, the nonmoving party must come forward with specific facts showing that there is a material issue of

1. One of the third-party defendants, Great Lakes Development Corporation, filed its motion on August 1, 1991, well after the deadline set by the Court's March 25, 1991 pretrial order. Since the Local Rules applicable to motions filed on or after August 1, 1991 establish a briefing schedule that would extend into mid-September and this matter is on the Court's October Trailer Docket, the merits of this motion will not be addressed.

2. Plaintiff also seeks to recover the costs it incurred in cleaning up an equipment plant at CWC Plant # 1. The motions before the Court are limited to only the transformer oils.

fact on an issue which the nonmoving party will bear the burden of proof at trial. Fed. R.Civ.P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. If after adequate discovery the party bearing the burden of proof fails to make a showing sufficient to establish an essential element of his claim, summary judgment is appropriate. *Id.*

### IV.

■ The plaintiff maintains that Textron is liable for its disposal of the transformers under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3). To establish liability under that section, a plaintiff must establish: (1) that the defendant was a person within the meaning of the statute; (2) that he owned or possessed hazardous substances; (3) that defendant, by contract, agreement or otherwise, arranged for the disposal or treatment of those wastes at a facility; (4) that a release or threatened release of a hazardous substance at the site occurred; and (5) that response costs were incurred as a result of the release or threatened release. *E.g., C. Greene Equip. Corp. v. Electron Corp.*, 697 F.Supp. 983, 986 (N.D.Ill.1988).

■ The plaintiff contends that Textron "arranged for" the disposal of the transformers when it sold CWC Plant # 1 to Delta in October of 1986. If the sale of a hazardous substance can be characterized as a transaction concerning the disposal of hazardous substances, then an individual who sells such substances may be subject to liability under Section 107(a)(3). *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir.1990); *United States v. Aceto Agric. Chem. Corp.*, 872 F.2d 1373, 1381 (8th Cir.1989). For example, an individual who seeks to dispose of hazardous wastes by selling them for use in a manufacturing process is a responsible party under CERCLA. *E.g., United States v. Conservation Chem. Co.*, 619 F.Supp. 162, 241 (W.D.Mo.1985); *New York v. General Elec. Co.*, 592 F.Supp. 291, 297 (N.D.N.Y.1984). By comparison, an individual who sells a hazardous substance to another for use in a manufacturing process and not for disposal is not

liable under CERCLA even if the substance is found in the effluent from that process. *E.g., Edward Hines Lumber Co. v. Vulcan Materials Co.*, 685 F.Supp. 651, 654–55 (N.D.Ill.), *aff'd on other grounds*, 861 F.2d 155 (7th Cir.1988). Therefore, this Court must look beyond Textron's characterization of its decision to sell CWC Plant # 1 to determine whether the transaction involves an arrangement for disposing of a hazardous substance. *Aceto*, 872 F.2d at 1381.

In the present case, Textron's third-party complaint suggests that its decision to sell CWC Plant # 1 was a transaction for the disposal of hazardous materials. It alleges that Delta agreed to "be responsible for properly disposing of all PCB-containing transformers on the property and take responsibility for any hazardous conditions found on the property." Third–Party Complaint, ¶ 16. It also alleges that in return for that promise the property was sold well below its market value. *Id.*

There is evidence in the record to support those allegations. Once Textron decided to terminate the "mothball" status of CWC Plant # 1, its useful equipment was either transferred to other Textron plants or sold to third parties. Kelly Dep. at 39; Swartz Dep. at 41–42. However, Textron did not consider the transformers to be readily saleable due to the PCBs. Brown Dep. at 54. Furthermore, the cost of removing and disposing of the transformers was estimated to be $130,000. Plaintiff's Response to Defendant's Motion for Summary Judgment, Exh. B. In addition, Textron believed that only one landfill in the United States would accept equipment containing PCBs. Garbison Dep. at 60. Given the lack of a resale market for the transformers and the difficulty and high cost associated with disposing of them, Textron had reason to consider more expeditious and economical ways to rid itself of them.

Moreover, Textron's negotiations with Delta suggest that it viewed the sale of CWC Plant # 1 as a way to dispose of the transformers. Representatives of Delta repeatedly assured Textron that it would take responsibility for the transformers if

they were not used in its redevelopment plans. Garbison Dep. at 48. The price of the building was heavily discounted to reflect that fact. *Id.* at 83. This evidence could lead a reasonable fact finder to conclude that Textron arranged for the disposal of the transformers by selling CWC Plant #1 to Delta.

■ Similarly, the motion filed by Delta must be denied as well. There is evidence in the record that would support Textron's allegation that Delta agreed to be responsible for the proper disposal of the transformers if it had no use for them. Furthermore, Delta's redevelopment plans for CWC Plant #1 were abandoned due to its inability to obtain approval from the City of Muskegon Heights. Having abandoned its redevelopment plans and with them any possible use it may have had for the transformers, Delta was faced with the problems associated with the proper disposal of transformers containing PCBs. This evidence could lead the trier of fact to reasonably conclude that Delta sought to avoid its obligation to properly dispose of the transformers by selling the plant to Great Lakes for a fraction of the cost of their disposal. If such a finding were made, then the fact finder could also conclude that Delta arranged for the disposal of a hazardous substance when it sold the building.

## V.

Summary judgment is also sought on the portions of the complaint and third-party complaint alleging violations of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. §§ 2601–29. Both complaints allege that violations of the TSCA are negligence *per se.* The moving parties argue that the remedies provided by the TSCA are the only recourse available to an injured party.

■ The TSCA grants injunctive relief to one aggrieved by a violation of its provisions. *Id.* § 2619(b)(1). Given Congress' decision to grant only injunctive remedies to those aggrieved by a violation of the TSCA, this Court can not hold that a private right of action for money damages exists under it. *See Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26 (1975). "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. In the absence of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate." *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981) (citations omitted). The TSCA was enacted "to prevent unreasonable risks of injury to health or the environment associated with ... chemical substances." S.Rep. No. 698, 94th Cong., 2d Sess. 1, *reprinted in* 1976 U.S.Code Cong. & Admin.News 4491. Since remedial remedies would not be consistent with that goal, a private right of action for violations of the TSCA would not be appropriate. *E.g., Welch v. Schneider Nat'l Bulk Carriers,* 676 F.Supp. 571, 577 (D.N.J.1987); *Adams v. Republic Steel Corp.,* 621 F.Supp. 370, 376 (W.D.Tenn.1985). The issue before this Court is whether Congress' decision not to provide in the TSCA an action for money damages preempts a negligence or negligence *per se* cause of action alleging a violation of one of its provisions.

■ The Supremacy Clause of the Federal Constitution requires the invalidation of state laws that interfere with or are contrary to federal law. Congress can explicitly prohibit state regulation of a given field, either in the statute or in its legislative history. *Pacific Gas & Elec. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). Congress may also prohibit state regulation by implication. If the scheme of federal regulation is so pervasive that a court can reasonably infer that Congress left no room for the states to supplement it, preemption will be implied. *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 249, 104 S.Ct. 615, 621–22, 78 L.Ed.2d 443 (1984). If the federal statute touches an area in which the federal interest is exceedingly dominant over the state interest in that field, *e.g., Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458

U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982), or if the objectives of the federal legislation and the character of the obligations imposed by it reveal a purpose to preclude state law, *e.g., Pacific Gas,* 461 U.S. at 203–04, 103 S.Ct. at 1721–22, preemption of state law may be inferred. Even when Congress does not intend to preempt state law, it is preempted "to the extent that it actually conflicts with federal law." *California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 281, 107 S.Ct. 683, 689–90, 93 L.Ed.2d 613 (1987). Conflicts may also arise when it is physically impossible to comply with both federal and state regulations, *e.g., Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or when state law stands as an obstacle to the accomplishment of federal objectives, *e.g., Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Under Michigan law, the violation of a statute can be used to establish negligence. If the statute is intended to protect against the alleged injury and the plaintiff is within the class intended to be protected by the statute, then a rebuttable presumption of negligence premised on the violation of the statute exists. *Klanseck v. Anderson Sales & Serv.,* 426 Mich. 78, 86–87, 393 N.W.2d 356, 360 (1986); *Zeni v. Anderson,* 397 Mich. 117, 128–29, 243 N.W.2d 270, 276 (1976). Absent a legally sufficient excuse, a jury may infer negligence on the basis of the violation and, if the violation of the statute was a proximate cause of the injury, may return a verdict for the plaintiff. *Klanseck,* 426 Mich. at 86, 393 N.W.2d at 360.

Although a violation of a statute will not necessarily lead to a verdict for the plaintiff, it is nonetheless clear that the success of a cause of action alleging negligence *per se* is largely controlled by the existence of such an event. As such, a negligence *per se* claim alleging a violation of the TSCA is little different than an implied right of action under the TSCA for money damages. Since the latter is not available because of Congress' desire to provide aggrieved parties with only equitable remedies, this Court finds that the former is preempted as well. Otherwise, the common law of Michigan would be in direct conflict, on its face, with federal law, a situation prohibited by the Supremacy Clause. *Guerra,* 479 U.S. at 281, 107 S.Ct. at 689–90; *Florida Lime,* 373 U.S. at 142–43, 83 S.Ct. at 1217–18. *See cf. Compco Corp. v. Day–Brite Lighting, Inc.,* 376 U.S. 234, 237–38, 84 S.Ct. 779, 781–82, 11 L.Ed.2d 669 (1964); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231–32, 84 S.Ct. 784, 788–89, 11 L.Ed.2d 661 (1964) (holding that a State's unfair competition law cannot protect against the copying of items placed in the public domain by federal patent and copyright law). Therefore, the portions of the complaint and third-party complaint alleging that a violation of the TSCA is negligence *per se* are dismissed.

## VI.

For the reasons stated above, the motions filed by Textron and the third-party defendants are granted in part and denied in part. With regard to the CERCLA claim, they are denied. Said motions are granted on those portions of the complaint and third-party complaint alleging that a violation of the TSCA is negligence *per se.*